No. 46,585

Avis F. Drake, Widow of Darrell A. Drake, Deceased, *Appellee,* v. State Department of Social Welfare—Larned State Hospital, *Appellant.*

(499 P. 2d 532)

Opinion filed July 19, 1972.

*Hal E. DesJardins,* of Topeka, argued the cause, and *Woody D. Smith,* of Topeka, was with him on the brief for the appellant.

*Dan E. Turner,* of Turner and Balloun, Chartered, of Great Bend, argued the cause, and *J. Eugene Balloun, Lee Turner* and *Mary A. Senner,* of the same firm, and the firm of Smith and Burnett, of Larned, were with him on the brief for the appellee.

The opinion of the court was delivered by

Schroeder, J.: This is an appeal in a workmen's compensation case by the State Department of Social Welfare, the self-insured respondent, from an award to the widow and sole dependent of the deceased workman.

The only points presented on appeal are whether the trial court erred in finding ( *a* ) that the deceased workman sustained personal injury by accident arising out of and in the course of his employment; and ( *b* ) that the injury the deceased workman sustained was instrumental in part and was a contributing cause of his death.

The claimant, Avis F. Drake, contends the deceased workman, Darrell A. Drake, suffered an injury to his back on October 10, 1967, by accident and in the course of his employment as an

assistant engineer at the Larned State Hospital, and that this injury was a contributing cause of his death on January 5, 1968. The respondent contends there has been no showing of a personal injury by accident arising out of and in the course of employment, and further that there is no substantial competent evidence to show that such injury, if there was one, caused or contributed to the workman's death.

Darrell A. Drake was employed as an assistant chief engineer for the Larned State Hospital. On October 10, 1967, Drake in the company of three other Larned State Hospital employees went to a warehouse on the hospital grounds for the purpose of inspecting some compressors. In front of the warehouse in question is a landing or dock about two feet high or slightly more. Viewing the evidence in the record most favorably to the claimant, Drake slipped while entering upon the landing and injured his back.

The claimant contends the decedent's back became very painful which made it extremely difficult for him to cough and to clear his lungs. The condition was so aggravated that he was forced to enter the hospital for severe respiratory distress and back pain and was making a recovery when a complication set in and he died from the combined results.

The examiner found, in addition to the stipulations, that the workman did, in fact, sustain some injury to his back while engaged in his work, but that the back injury apparently sustained had nothing to do with the workman's death. The examiner denied compensation.

On appeal to the district court of Pawnee County, Kansas, the district court found that Drake sustained personal injury by accident arising out of and in the course of his employment, and that the injury sustained was instrumental in part and was a contributing cause of his death. Accordingly, the claimant was awarded compensation.

Under K. S. A. 1971 Supp. 44-556, the Supreme Court on appeal in a workmen's compensation case is limited to determining questions of law. (*Morgan v. Auto Transports, Inc.*, 192 Kan. 139, 141, 386 P. 2d 230.) On the issues here presented our only function in reviewing the case is to determine whether the trial court's findings are supported by substantial competent evidence.

In reviewing the record to determine whether it contains substantial evidence to support the findings of the trial court, this court is required to review all of the evidence in the light most

favorable to the prevailing party below. (*Jones v. City of Dodge City*, 194 Kan. 777, 778, 402 P. 2d 108.)

The term "substantial evidence," when applied to workmen's compensation cases, means evidence possessing something of substance and relevant consequence, and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved. (*Jones v. City of Dodge City*, supra; *Weimer v. Sauder Tank Co.*, 184 Kan. 422, 337 P. 2d 672; and *Barr v. Builders, Inc.*, 179 Kan. 617, 296 P. 2d 1106.)

Reviewing the evidence, properly admissible in a workmen's compensation case, as we must, the record discloses substantial competent evidence to sustain the trial court's finding that the deceased workman sustained personal injury by accident on October 10, 1967, arising out of and in the scope of his employment.

Mrs. Drake, the claimant and widow of the deceased, testified that her husband had spoken to her about the incident upon arriving home from work that evening; that he complained of backaches which he attributed to a slip on the dock at his place of employment. Mrs. Drake kept a diary in the form of a calendar and made detailed entries concerning her husband's complaints and condition. According to Mrs. Drake her husband complained of back pain every day between October 11 and October 23, 1967. He had returned to work on October 11, 1967, but came home complaining of back pain. He never returned to work, remaining at home until he entered the Larned Hospital on October 23, 1967. He was transferred to the Wesley Medical Center in Wichita on December 5, 1968, and during this period he constantly complained of back pain.

The decedent consulted Dr. Brenner for his back condition, and Mrs. Drake testified Dr. Brenner told her the decedent's problem was not pleurisy but back trouble. She told of rubbing liniment on his back because of the complaints he made, and how he slept in a chair because his back pained too much for him to lie down. While the three men accompanying Drake to the warehouse on October 10, 1967, did not observe Drake slip, they were not particularly observing him on the occasion, and one admitted on cross-examination that the accident could well have happened as Mr. Drake said it did.

Both the hospital records, after the decedent's admission to the

hospital, and the doctor's notes attribute the decedent's injury to a fall at work and indicate the persistent complaints of back pain by the decedent. Medicine was prescribed for such pain and administered. All of the foregoing evidence is consistent with the widow's testimony.

Whether the injury sustained by the decedent on October 10, 1967, was instrumental in part and a contributing cause of the decedent's death is a more difficult question.

The only medical witness to testify was John K. Fulton, M. D. The testimony of Dr. Fulton is extensively set forth in the record, followed by a summary of hospital records, doctors' notes and nurses' notes, all made during the decedent's stay in Wesley Memorial Hospital up to the date of his death on January 5, 1968. The discharge summary prepared subsequent to the decedent's death indicates the following concerning his prior medical history and eventual death:

"This 59 year old white male was readmitted to the hospital because of the development of a severe respiratory distress. He had been previously admitted twice before to this hospital, the initial admission being in August of 1966, following which he fared quite well, and was able to return to work for a year. He quit smoking after his first admission, but resumed smoking in 3 weeks. He returned in August of 1967, with a similar picture, but development of mild polycythemia, at which time venisection was done with restoration of the hematocrit to normal, and he was continued on steriods, bronchodilators, and was again off cigarettes and was able to work until October of 1967 when he sustained a fall at work, which seems to have injured his dorsal back, and this was followed by the development of severe pain in the back and chest, which may have prevented cough.

·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·

"Although it was slow, the patient eventually improved regarding his wheezing breath sounds, and became good enough so that he was able to discontinue oxygen and to go to the general floor, then seemed to deteriorate suddenly, became much more dyspneic, wheezed more severely, and was transferred back to special care. On 1-1-68 the patient suddenly became comatose with complete loss of all peripheral reflexes, and though his respirations continued good and his blood gasses reasonably satisfactory, the patient never regained consciousness. The coma corresponded with an elevation of temperature, which persisted until the time of his death."

According to Dr. Fulton the cause of death was extensive pneumonia involving both lungs and complicating the emphysema. Dr. Fulton testified he first attended the decedent on August 15, 1966, and the decedent gave a history of a tendency to wheezing dyspnea since age twelve which had become more constant in recent years.

When Dr. Fulton was asked to relate in full the mechanism by which he felt the back injury was associated with the workman's death he testified:

"Well, I stated that at that time in October he was said to have sustained a back injury while at work. This being associated with considerable pain on coughing, which in turn led to inhibition to cough by the patient with consequent accumulations of secretion in the bronchial tree. Also, apparently contracted bronchial infection about this time, and because of the severe back pain, was unable to combat this by the methods usually available by normal healthy people, namely, use of the normal cough mechanisms to expel the infected material. Being subject to chronic lung disease, the inability to raise these secretions was all the more disastrous, since his lung function was seriously compromised at death and the accumulation of this additional handicap precipitated the severe respiratory distress and necessitated the hospitalization, first at Larned, and then at the Wesley Medical Center."

Dr. Fulton testified:

"Q. All right. Now, did the back pain have anything to do with his ability to cough?

"A. It would in this respect, a cough would be more painful and therefore, would be something he would probably tend to involuntarily inhibit somewhat.

"Q. Did he tell you it hurt him to cough?

"A. Yes, he did."

In Dr. Fulton's opinion, based upon reasonable medical certainty, it was probable that the decedent's back injury was one of the contributing causes of his ultimate death.

When the decedent was admitted to the hospital on August 16, 1966, X-rays of the chest were made which showed the dorsal spine to good advantage on the lateral film. At that time mention was made of a moderate degree of pulmonary emphysema but there was no mention of any abnormality of the dorsal spine.

A year later he was hospitalized again in August, 1967, at which time another chest film was taken. The statement made by Dr. Porter who read the film was, "No active chest disease is seen. Skeletal structures showed no gross abnormalities."

On December 6, 1967, during the decedent's last illness a chest X-ray was taken shortly after his admission. It showed, what was described by the radiologist as, essentially negative chest, X-rays of the dorsal and lumbar spine taken this same day showed no evidence of destructive change of traumatic, inflammatory, neoplastic origin in the bony component of the lower dorsal and upper lumbar spine. Degenerative changes were seen in the dorsal and lumbar vertebra.

Dr. Fulton testified:

"A re-check dorsal spine was taken the same day and compared with the previous examination of 12/6/67, and I'm quoting directly, the dorsal spine reveals marked osteoporosis and there is evidence of rather marked compression of deformities of the 6th and 8th dorsal vertebral bodies. These were not present in 1966, but in restrospect, are visualized in the previous chest film of 8/15/67. There is also a slight degree of wedging or collapse of the body of the 11th dorsal vertebra. The pedicles are fairly well visualized. Intervertebral spaces appear to be intact."

The doctor testified these abnormalities were present on August 16, 1967, as shown by the X-ray, but he added, "the patient had not complained much of pain until his last admission." He then testified:

"Q. All right. Doctor, let me ask you this, if this man complained that he had an accident on the 10th of October, 1967, how could the x-ray taken on— in August 16, 1967, show this purported injury?

"A. Well, they wouldn't have shown the new injury as a new finding, no, sir.

"Q. All right.

"A. What I'm trying to say is that I—the patient said that he fell, he said he hurt. I had every reason to believe that he hurt, but as far as saying that these x-ray changes were a result of the fall, I couldn't say that, no, sir.

"Q. All right. As a matter of fact, all the x-ray changes seem to have taken place on August 16th of 1967, is that correct?

"A. Well, I wouldn't say all, but at least, many of them were seen before.

"Q. The only changes that took place from August 16, 1967, and December 6, 1967, were degenerative type changes, is that correct, Doctor?

"A. Yes, sir. . . . This man received and had to have a very long period of time, Prednisone, which is a sort of Cortisone for the treatment of his severe emphysema. This has an effect on bones of causing a weakening, softening of their structure, so that they are more vulnerable to injury, and very probably that was a contributing factor.

. . . . . . . . . . . . .

"Q. Now, back to the original, the pain, as I recall your testimony, this pain could have been caused from his Cortisone treatment, is that correct?

"A. Could have been contributed to by the Cortisone treatment.

"Q. Could it have been caused by the Cortisone treatment?

"A. Not alone, no.

"Q. What else could have caused it?

"A. The Cortisone alone doesn't fracture the bones. There has to be some trauma, there has to be some force exerted against the bones.

"Q. The bones were fractured, is that correct?

"A. They were described as being wedged, which means probably a degree of fracture or compressing of the vertebra.

"Q. I see. Did I misunderstand you or did you say the Cortisone could have caused the wedging?

"A. It can weaken the bones to the point that they are more vulnerable to force or stress.

"Q. I see. And you are making this assumption based upon the x-rays that were taken 8/16/66?

"A. '67.

"Q. '67. All right. And they were wedged at that time?

"A. Yes.

"Q. Doctor, how long had the deceased been on the Cortisone treatments?

"A. He had been, I think, taking Cortisone, approximately from 8/15/66, until his admission on 8/14/67, and he had cut the dose down to the point that at the time he came back in the hospital in 1967, he was taking a fairly small dose of Prednisone, just two tablets, or 10 milligrams a day. This is considered a small maintenance dose and not an amount that generally produces osteoporosis very severely in men.

"Q. All right. Now, Doctor, based upon the x-rays taken on 8/16/67, in your opinion would that have been the condition that existed at that time, would that have been sufficient to cause the pain of which the deceased complained of when you treated him?

"A. He was not complaining of pain at the time he came in in August of 1967. He had the x-ray changes as observed in retrospect, but he was not complaining of symptoms from those changes.

· · · · · · · · · · · · · ·

"Q. (By Mr. DesJardins) Now, to your last paragraph of your report of February 20, you state that you did not care for Mr. Drake immediately following the back injury?

"A. No, sir.

"Q. Assuming there was a back injury.

"A. Yes, sir.

"Q. Did you consult with the physician that did care for him immediately after the purported injury?

"A. No, sir.

"Q. All right. Do you think he would be in a position, perhaps in a better position, to state as to what caused or didn't cause Mr. Drake's final condition?

· · · · · · · · · · · · · ·

"A. Well, I think Dr. Brenner would be in a better position than I to know what the exact relationship was to this fall, and the onset of his back pain. This was the history that was not foremost in the patient's mind at the time he came to see me, and it wasn't immediately brought out what the fall might have had to do with his severe respiratory distress.

"Q. I see. So in your opinion, Dr. Brenner would be the best one to be able to tell as about that?

"A. The relation between the injury and the pain, yes, sir.

· · · · · · · · · · · · · ·

"Q. Doctor, would it change your opinion now, thinking back, wherein it's been stated that the purported accident happened on the 10th of October, 1967, the x-rays show the changes is August of '67, does that change your opinion any?

"A. It doesn't change my opinion about the existence of the pain, no, sir. Because the pain could be quite independent of the x-ray changes. He may have injured his back in an additional way that wasn't clearly seen on the x-rays."

The discharge summary of Dr. Fulton concluded: "The presumed cause of death is the left cerebral artery thrombosis superimposed on long standing chronic bronchitis with chronic pulmonary insufficiency and threatening $CO_2$ narcosis."

In our opinion the record discloses substantial competent evidence to sustain the trial court's finding that the injury the decedent sustained on October 10, 1967, was instrumental in part and was a contributing cause of the decedent's death on January 5, 1968. A preexisting condition was aggravated by the back injury, which complicated the decedent's progress and ability to recover. The record discloses a causal connection between the accidental injury the workman sustained and his death.

Although a workman is afflicted with a disease which eventually culminates in his death, neither he nor his dependents are thereby barred from the right to compensation, if the workman actually suffered an accident arising out of and in the course of his employment, and if such accident intensified or aggravated his affliction or contributed to his death. ( *Lee v. Lone Star Cement Co.*, 142 Kan. 349, 46 P. 2d 864; *Shapland v. Ferguson Furniture Co.*, 139 Kan. 768, 33 P. 2d 145; and *Gilliland v. Cement Co.*, 104 Kan. 771, 180 Pac. 793.)

An analogy is found in *Evans v. Western Terra Cotta Co.*, 145 Kan. 924, 67 P. 2d 426. There compensation was granted to the widow of a deceased workman who had a preexisting hernia condition. The deceased workman sustained an accident on the job and his hernia became strangulated and required surgery. Following surgery he died of a post-operative thrombosis, not related to the preexisting condition, or the injury at work. There was, however, a causal connection between the accidental injury the workman sustained and his death.

The judgment of the lower court awarding compensation to the claimant is affirmed.