No. 47,146

M. A. RUND, *Appellee,* v. CESSNA AIRCRAFT COMPANY and HARTFORD
ACCIDENT & INDEMNITY COMPANY, *Appellants.*

(518 P. 2d 518)

Opinion filed January 26, 1974.

*Norman I. Cooley,* of McDonald, Tinker, Skaer, Quinn, and Herrington, of Wichita, argued the cause, and was on the brief for the appellants.

*Dan Forker,* of Hodge, Reynolds Smith, Peirce & Forker, of Hutchinson, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This appeal arises from a proceeding under the Workmen's Compensation Act (K. S. A. 44-501, *et seq.*) wherein the respondent employer and its insurance carrier appeal from a decision of the district court granting claimant a running award for temporary total disability together with past and future medical benefits.

The basic issue on appeal is whether claimant's psychiatric problems, accounting for the sizeable award, are compensable under the facts and circumstances presented by the record.

The evidence presented to the workmen's compensation examiner is summarized as follows:

The parties stipulated that on August 23, 1971, Mrs. Mable Rund, claimant, was employed by the Cessna Aircraft Company, respondent, and was governed by the Kansas Workmen's Compensation Act. On that date claimant, age 41, testified she was engaged in the routine tasks associated with her job. Just before noon she was in the process of pushing a cart of six or eight machine parts to an oven to have them baked. While in route to the oven claimant's left foot slipped on some solvent or degreaser. Her left foot went out from under her and twisted as she hung onto the cart. Claimant immediately felt severe pain in her knee, and she thought it went out of its socket. Since it was noon, claimant said she painfully limped approximately 50 feet to the place where she ate her sack lunch. After lunch she made her way another 100 feet to the first aid room. Upon arriving at first aid claimant explained what had occurred to the nurse, Mrs. Bennett. Claimant testified Mrs. Bennett paid little attention to her problem and merely gave her some aspirin. Claimant continued working the rest of the day.

The following day the claimant again went to work. Some time during the first part of the morning claimant returned to first aid because she said her foot, ankle and lower leg were swollen. By claimant's description her ankle, foot, lower leg and knee were swollen twice their normal size. On this occasion Mrs. Bennett offered to apply heat treatment but claimant refused because she assumed she would have to undress for it, and she was afraid some

men might come into the room. On this day claimant remained on the job.

The first thing on the next day the claimant went to first aid and reported to Mrs. Bennett that during the night her back began hurting and the pain had intensified from the hip all the way down. The claimant described herself as ". . . dragging from my waist down to my foot, just dragging my whole leg." Claimant testified Mrs. Bennett immediately told her to see the doctor and not to clock off or tell anybody. Claimant conjectures, ". . . because I looked pretty bad and I was walking pretty badly. I was just dragging and she signed me out and I went on company time."

The claimant was sent to see Dr. Crawford who is the respondent's company doctor. At this session, according to claimant, the doctor merely took X-rays and prescribed pain pills for her. The claimant returned to work for about two and one half hours and then went home. The next day the claimant did not feel like working so she called and said she was sick. Claimant did not return to work for some time. She continued to see Dr. Crawford a couple of times a week. Claimant testified that Dr. Crawford told her the reason she was suffering so badly was because her body was twisted and sprained from her feet to her head, and that she would not heal for an indeterminable period of time. Eventually, Dr. Crawford referred claimant to Dr. Jarrott, an orthopedic surgeon.

According to the claimant, Dr. Jarrott took several X-rays of her ankle, knee and back. At this time she was particularly concerned with the pain in her hip. She received a cortisone injection on one occasion from Dr. Jarrott.

Subsequently, upon the recommendation of her union, claimant went to see a Dr. Taylor. Dr. Taylor suggested claimant go see Dr. Moe, a psychiatrist with the Hutchinson Mental Health Institute. Very few questions were asked of claimant concerning her contacts with Dr. Moe. However, she did testify that Dr. Moe told her she could not return to work and that it would probably be a long while before she did.

Finally, on November 2, 1971, the claimant received a call from Dr. Crawford's office that she was released to return to work. Claimant was shocked to receive this information. She had not seen Dr. Crawford for approximately three weeks or Dr. Jarrott for about a week, and was currently going to see Dr. Moe. She did

not feel that she was ready to return to work at that time. Following instructions, however, she reported to work that afternoon. She warned the foreman that he should keep a close watch on her because she was too weak to work. She was doing some rather heavy work that afternoon and according to her, soon became very dizzy. She asked another employee to tell the foreman she was about to pass out. The foreman, Mr. Carlton, checked on the claimant and she told Mr. Carlton she could make it to first aid by holding onto tables or the walls along the way. Claimant says she struggled down to first aid where Mrs. Bennett took her blood pressure and eventually sent her home.

Also in evidence before the examiner and the trial court was the testimony of Dr. Crawford, Dr. Jarrott, Dr. Moe, Mrs. Martha Bennett, and Mr. Carl Carlton.

Dr. Crawford testified he first examined claimant on August 25, 1971. He X-rayed all parts of her body she complained were hurting. At that time he advised heat treatments and prescribed a pain killer. Dr. Crawford saw claimant a dozen times. He testified that on all occasions she walked in a perfectly normal manner. His examination did not disclose any bruises or discoloration with respect to any of the areas that she complained of, and at no time was the lower left leg swollen twice its normal size. In fact his examinations, including the X-rays, revealed *no pathological* defect in any of the joints she complained of. The most definitive testimony the doctor made on the issues of whether claimant had, in his opinion, been injured on August 25 is contained in the following questions and answers.

"Q. [Appellee's counsel] . . . Can you say, Doctor, with a reasonable degree of medical certainty that the injuries of which Mrs. Rund complained and for which you treated her were connected with the injury that she had reported to you at Cessna Aircraft?

"A. Right.

\* \* \* \* \*

"Q. (By Mr. Forker) Okay. And what you are saying then, Doctor, is knowing what she reported to you as to the nature of the injuries she received, and what you observed in the way of complaints and from the X-rays taken, would lead you to believe that the complaints derived from the injury at Cessna Aircraft Company, is that correct?

"A. Yes.

\* \* \* \* \*

"Q. [Appellant's counsel] Now, Doctor, Mr. Forker has asked you a carefully worded question as to whether or not you had an opinion as to whether

or not she hurt herself at work, and I just want to ask you the basis of your belief that she hurt herself at work is what she told you; is that not correct?

"A. That is correct.

\* \* \* \* \*

"Q. [Appellant's counsel] Now, although you had no objective findings and everything that you have had to do with reference to diagnosis has been based on subjective complaints—

"A. And objective X-rays.

"Q. —was there anything from her complaints, her reports to you of pain or difficulty, or the X-rays or anything that you did in diagnosing this case, that was out of the ordinary or not in perspective to the type of injury that she had reported to you?

"A. Well, only that I felt that her complaints were far out of proportion to what was evident, as far as her injury was concerned.

"Q. Only the severity or the degree of the complaint and not the type of pain reported or the location of the pain?

"A. And the length of time of the complaints."

On October 26, 1971, Dr. Crawford received Dr. Jarrott's report indicating claimant could return to work. Since Dr. Crawford concurred in this evaluation he had his office notify the claimant and the respondent of the decision. Though there is some confusion in the record it appears claimant returned to work at noon on November 2, 1971. Also submitted into evidence were three exhibits, two of which are Form G Physician's Report Blank, filled in by Dr. Crawford and a letter from him to appellant's counsel detailing his contact with the claimant. The Form G reports both described claimant's injuries as "Sprain and strain to left knee and ankle L. S. Spine within normal limits."

Dr. Jarrott, M. D., testified that he examined claimant on October 19, 1971. The examination consisted of X-rays taken by Dr. Jarrott, those taken by Dr. Crawford, a conference with claimant and an orthopedic examination. The following testimony was made in relation to the examination.

"Q. And what was your diagnosis?

"A. She has a congenital spondylolisthesis or spondylolysis with pedicle defects of the 5th vertebra. She has a possible trochanteric bursitis, and from a history standpoint a possible back strain.

"Q. Now, when you described a pre-existing spondylolysis, could you explain to us what you mean by that?

"A. Well, the vertebra is made up of a body and the processes that extend backwards are the pedicles on which the joints in the spinous processes occur. In spondylolysis, the pedicles are not formed with bone but by scar tissue.

"Q. Okay.

"Now, would it also be correct to say in this particular case you had superimposed over that preexisting defect the back strain of which she complained or explained to you?

"A. This would be the probable diagnosis that I would have to make, more on the history standpoint than anything else. Her examination revealed no neurological changes to indicate nerve root compression or disc pathology. Her standing views showed that she stands in lordosis, that is, sway-backed, and tends to close the disc space posteriorly which, of course, gives one a backache if they persist in this position.

\* \* \* \* \*

"Q. (By Mr. Forker) Dr. Jarrott, from your examination of the claimant, Mrs. Rund, from the X-rays available to you, including Dr. Crawford's X-rays, are you able to say with a reasonable degree of medical certainty that the pain and difficulty complained of by Mrs. Rund was caused by the injury which she described at Cessna Aircraft Products?

"A. Well, obviously, the only way that I can relate her findings to the accident is the history that she gave that she developed a backache after she slipped. Certainly the spondylolysis pre-existed the injury and if she sprained her back, she would get a backache."

". . . [T]he only thing I have to go by from a strain standpoint is what she told me, and her description, of course, fits that of a back strain."

Claimant's backache originated in the higher portion of her back and progressed downward. The doctor testified that in the usual case, back strain originates in the lower back and remains in a constant location. He also indicates that based on his examination there is no reason claimant cannot return to work.

Dr. Moe testified the claimant was referred to the Hutchinson Mental Health Institute by Dr. Taylor. During her visits claimant was seen by various office personnel including Mrs. Emma Schroeder, a psychiatric social worker, Mr. Jerry Doke, a clinical psychologist, as well as Dr. Moe. After claimant's social history was taken, she was given a series of tests including the Minnesota Multiphasic Personality Inventory, the Bender-Gestalt, the Draw-a-Person and others. The results of these tests indicated claimant was obsessive compulsive as a personality with a high degree of anxiety and a tendency toward hypochondriasis. She was in the bright and normal range of intelligence. There was also an indication of some unconscious conflict in the sexual area, possibly some guilt related to sexual matters, and an immaturity of a surprising degree. Dr. Moe testified that assuming there was no pathological reason for claimant's disability, that it could easily be explained from a mental standpoint. He elaborated as follows:

". . . She has a tendency to become obsessed with a certain problem. In this case it may have been the accident. She will tend to focus and get stuck on a certain problem and be unable to leave it alone and go on to an appropriate solution to that problem. She becomes obsessed and kind of becomes stuck with it, it remains in her mind excessively.

"And, as I mentioned, she has a tendency towards being hysterical. In people who have a propensity toward hysteria, we often see a mechanism which they use to handle inner tension by tying it down in a body region, in essence converting inner tension, emotional tension, into physical pain, and for some reason to this person physical pain is more acceptable, more honorable, more normal, than to display emotional upset and emotional pain.

"So testing did indicate this person has a tendency and propensity towards hysterical conversion mechanism, converting inner pain into physical pain.

❊   ❊   ❊   ❊   ❊

"A.   .   .   . [M]y impression is that her emotional problems have been of long standing—that is, for years. However, a person under such inner strain and pressure will overreact to any additional strain such as an accident, possibly, and then the emotional issue may come to the fore more or be exacerbated, and this is what we see having happened in her case: the emotional problems exacerbated by this accident.

"Q. Pardon me once more. By using the term 'exacerbated,' would it be a fair comparison to say that the physical injury at the job, combined with her emotional weaknesses and/or strengths, triggered the situation complained of in the complaints that you have described?

"A. I would think that would be a fair statement.

"Q. Now, you have used the term 'hysterical reaction' to that. Could you explain to us perhaps a little more fully what you mean by that?

"A. Well, an hysterical reaction may be demonstrated in various ways. In fact, the most common way and the way I mentioned here is the conversion reaction. In fact, it is diagnostically called an hysterical conversion reaction, and it is described in all the literature and in our diagnosing manuals.

❊   ❊   ❊   ❊   ❊

"A. I would like to clarify the diagnostic impression of the hysterical conversion mechanism by reading verbatim from the diagnostic and statistical manual of mental disorders issued by the American Psychiatric Association. Under Hysterical Neurosis, Conversion Type, it says: In the conversion type the special senses or voluntary nervous system are affected causing such symptoms as blindness, deafness, loss of smell, loss of sense of touch, strange feelings in various parts of the body, paralysis, unsteadiness of gait and various bodily pains and aches.

"It says furthermore often the patient shows an inappropriate lack of concern about these symptoms which may actually provide secondary gains by winning him sympathy or relieving him of unpleasant responsibilities.

❊   ❊   ❊   ❊   ❊

"A. I really should qualify that. Our diagnosis is not an hysterical conversion type neurosis. Our formal diagnosis is anxiety neurosis with hysterical features, with hysterical features. She has a tendency towards this. She is not an out and out full-blown case of hysterical conversion neurosis but she has a tendency towards it.

"Q. At one point earlier you made the comment that there was a feeling on the part of some of the workers who had worked with her that there might have been an element of malingering involved. Have you either confirmed or in your professional opinion ruled out the possibility of malingering?

"A. Well, there is no testing for that. That is merely a subjective impression. And malingering, though, does imply a conscious intent to malinger, and I would like to qualify that impression of malingering by saying that it is not a conscious intent on her part but it is merely an unconscious level that is unknown to her and that her present physical symptoms do award her secondary gains; that is, special awards, in a physical and emotional sense, insurance-wise, sympathy-wise, and so on.

"Q. In your opinion, Doctor, then, she does in fact feel the pain she complains of?

"A. I am sure she feels the pain, yes.

"Q. And I believe you have already said that assuming that pain is not objective in nature or neurological in nature, it is nevertheless very real to her?

"A. It is real to her."

The doctor continued by stating the reason claimant resisted returning to work was that she obtains gratification in secondary gain from being disabled emotionally and physically as she says she is. There are some sexual matters that she has strongly requested be kept confidential, which would impose a mental hardship on her in her present state of mind, to return to work. She avoids sexual tensions in her relationship with male employees by simply remaining away.

On cross-examination Dr. Moe was asked about claimant's sexual implications with her job. He then testified:

"Q. Now, what, in general terms, is it about the job that creates the sexual implication? Is it the presence and contact with other men in general?

"A. Well, Mrs. Rund is morally a very proper and upright individual. That is how she sees herself. At her place of employment, there is much going on of a sexual nature that she finds threatening.

"Q. What is going on that she interprets as being of a sexual nature, would that be correct?

"A. Yes, that she interprets of a sexual nature.

"Q. Would it—

"A. She finds it threatening.

"Q. Could she conceivably have such a threat in other kinds of activities other than work—for instance, going to church or wherever she might find herself?

"A. She has no other fears that are of a degree that is as severe, no. Otherwise, as far as I know, she functions quite well."

\* \* \* \* \*

"Q. Okay.

"With respect to her physical side, physical condition, is it a fair statement that any relationship between the accident which she alleges and a physical disability is basically in her mind, something which she believes?

"A. *Well, I have no report from the other physicians who have examined her physically. I don't know if she has any physical damage.*

"Q. Okay. Assuming that it was—that the doctors did not find, as Mr. Forker indicated earlier, objective evidence of actual physical disability, in the sense of troubles with the joints, the bones, muscles, ligaments, this type of thing—assuming no bruises of any kind and so forth, no swelling, is it your view that she is physically—or would you disagree with the other doctors who would say she is physically able to work, discounting the mental picture?

"A. Yes, I would say specifically then she is able to work, but emotionally she is not.

"Q. Right, I understand.

"So, in other words, your basic view is that she is unable to work solely because of emotional problems that she has?

"A. On the basis of what you said, yes, I would say that.

"Q. Right. Assuming there is no physical disability?

"A. Uh-huh." (Emphasis added.)

Dr. Moe was "disinclined to think" claimant's alleged injury was make-believe because he doesn't think ". . . she would lie, actually outright lie about having an accident." He did conjecture, however, that claimant could exaggerate an insignificant occurrence.

Further testimony was elicited from the doctor to the effect claimant was not, up to January 4, 1972, emotionally and mentally ready to return to work, assuming she was pathologically ready. He said her condition would probably worsen during prolonged and extended litigation but would resolve itself ". . . almost immediately as soon as the insurance matter is taken care of one way or the other." He qualified the preceding statement somewhat by stating if the insurance matter is not resolved in her favor she may unconsciously elect to remain disabled in order to demonstrate to her family and others that she had been ill all along.

Martha Bennett testified she is a registered nurse and is in charge of respondent's first aid department. She related that she saw claimant on several occasions from the end of August up to November 2, 1971. Claimant reported to the office on August 23 complaining that she slipped on solvent and twisted her back, ankle, and knee. Mrs. Bennett suggested heat treatment but claimant refused. On August 24, she returned complaining of pain. Mrs. Bennett examined claimant's left knee and testified it was not swollen and that claimant did not react to pressure being put around the knee area. Claimant again reported to the first aid office on August 25. This time she complained more about her knee and ankle than her back. On this occasion the claimant was sent to see Dr. Crawford. The following morning claimant reappeared, and told Mrs. Bennett the pain was worse. Mrs. Bennett repeated the same examination of the knee area and discerned nothing but sent her home anyway.

The next time Mrs. Bennett saw the claimant was on November 2, 1971, when claimant returned to work. About 3:00 p. m. claimant reported to Mrs. Bennett that she was too dizzy and weak to continue working. Her blood pressure was measured as a normal 148 over 72 with a good quality pulse rate of 76. Regarding the pulse rate Mrs. Bennett stated:

". . . [I]t was of very good quality, there wasn't anything wrong with her, she wasn't going to faint, nobody will faint with a pulse of 76."

The witness had occasion to observe claimant's walking that day and described it as normal.

The witness also testified as to claimant's customary habits around the plant prior to the injury in controversy. When the claimant came to work she would wear real tight clothing, usually black. Her body figure was described as short and "very well endowed on the top half." She wore a lot of cake make-up and she would go to the rest room about three times a day and completely redo her make-up "Down to putting clean Arrid under her arms, arm-pits", and work on her hair. In commenting on claimant's association with male employees at the plant Mrs. Bennett said, "she chased one employee out here so that it was a comment of everyone in the plant, not only to me, but everyone that worked in her area or anyplace else in the plant." No male employee chased her or encouraged her. The particular male employee claimant was chasing was much younger than claimant and he tried to reject her.

The only other witness to testify in this matter was Mr. Carl Carlton, claimant's foreman. He related that on three occasions he had admonished claimant about spending too much time in the rest room. On November 2, 1971, Carlton testified he was called over to claimant and she told him she was too dizzy to continue working. He noted that her appearance was normal and that when she left to go to first aid she walked normally and with no difficulty whatsoever.

Mr. Carlton confirmed what Mrs. Bennett said about claimant's wearing make-up and the wearing of tight fitting clothes. As a result, he said, a company dress code was put into effect to ban the wearing of tight fitting clothes at work. He described claimant's relationship with co-employees as: "Well, it wasn't the best, I'll tell you." Other employees resented her attitude. She liked to imply that she was a little nicer than most everybody else, and "she thought she was pretty cute. . . ." She directed her attentions

to one particular male employee who attempted to discourage claimant's aggression.

When the claimant returned to work on November 2, 1971, she complained of being dizzy, and in her testimony was asked whether anyone helped her go to first aid, she answered:

"A. No, Carl Carlton asked me if I could make it and I said, 'Yes, I think if I can hold onto the tables.' To me, it's very embarrassing, you have to know what Cessna is like in order to know how a woman feels out there, but I thought if I could make it, you know, just by holding onto the wall and get down there and get out under my own power, why, it wouldn't be nearly as embarrassing because out there the minute a woman walks by all work automatically stops and every eye goes on that woman and so—

"Q. (Interrupting) Did you find that to be something you didn't like?

"A. Well, it isn't that you don't like it exactly, I mean, but when you are sick you don't like it, and when you look terrible and you feel terrible and you think you might pass out any time, you don't want everybody watching you."

The claimant's claim for compensation was first considered on December 13, 1971, by the hearing examiner for the workmen's compensation director. The parties stipulated the relationship of employer and employee existed, that the parties were governed by the Workmen's Compensation Act, and that a written claim was timely filed. The examiner found claimant met with personal injury by accident on or about August 23, 1971, which arose out of and in the course of her employment. Claimant was awarded 415 weeks of temporary total disability at the rate of $56 per week in the sum of $23,240. Additionally, respondent was ordered to pay claimant's medical expenses "as directed by Dr. Moe in not to exceed a total medical of $10,500.00."

On October 13, 1972, the workmen's compensation director approved the examiner's award as provided by K. S. A. 44-551 because respondent made no request for review.

The matter was appealed to the Reno County District Court where the findings and decision of the examiner, as approved by the director were adopted.

The first point asserted by the appellant is that the trial court erred in awarding workmen's compensation to the claimant for alleged traumatic neurosis in the absence of any substantial competent evidence that the claimant sustained a known personal injury which arose out of and in the course of her employment.

It must be conceded that whether the judgment is supported by substantial competent evidence is a question of law as distinguished

from a question of fact. (*Weimer v. Sauder Tank Co.*, 184 Kan. 422, 337 P. 2d 672.)

The term "substantial evidence", when applied to workmen's compensation cases, means evidence possessing something of substance and relevant in consequence, and carrying with it fitness to include conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved. (*Drake v. State Department of Social Welfare*, 210 Kan. 197, 199, 499 P. 2d 532; and *Jibben v. Post & Brown Well Service*, 199 Kan. 793, 433 P. 2d 467.)

On this point the appellants argue:

"In this action, the only 'evidence' of a physical injury consists of the testimony of the claimant alone, who describes herself as limping, or dragging her leg, and states her knee went out of socket, and that her ankle was swollen to double its ordinary size. The things claimant describes are capable of observation by laymen and medical providers, and the existence of a displaced knee joint and inflammation of tissue are capable of being found by medical examiners. Contrary to the claimant's testimony, that at the very time she says she suffered from the limping, dragging of her leg, displaced knee joint and swelling, every other witness in this case states she was not limping or dragging her leg, and that she did not have a displaced knee joint or swelling of her ankle. Furthermore, the medial [medical] evidence is uncontradicted that the claimant is not physically disabled, and was not physically disabled at the time of her various medical examinations."

It is not the appellant's contention that a claimant's testimony must always be corroborated. But in this case they argue:

". . . It is submitted that it is unreasonable to resolve the issue of injury, when such injury and its effects would be capable of observation or medical examination, by simply holding that the *claimant's testimony alone, although conflicting with the weight of the remainder of the evidence, constitutes substantial competant [competent] evidence.*"

In reviewing the record to determine if it contains substantial competent evidence to support the trial court's findings, all evidence reviewed by the Supreme Court will be considered in the light most favorable to the prevailing party below. (*Elliott v. Ralph Construction Co.*, 195 Kan. 723, 408 P. 2d 584.)

The appellant's argument boils down to an assertion that the claimant was not a competent witness, making reference to the testimony of Dr. Moe that the claimant showed "immaturity of a surprising degree."

We cannot say upon the record presented that the claimant was not a competent witness in her own behalf. The fact that the claimant is an interested witness does not render her testimony

incompetent, although it may have been discredited by the testimony of other witnesses. However, the weight to be given the evidence in its entirety was for the trier of the facts to decide. Whether the testimony of the claimant was "thoroughly discredited" was for the trial court, not this court to determine. We note there is corroboration of claimant's testimony concerning her physical injury by the testimony of Dr. Crawford, and the reports submitted by him, and by the testimony of Dr. Jarrott.

Accordingly, there is substantial competent evidence to support the trial court's finding that the claimant sustained an accident resulting in physical injury which arose out of and in the course of her employment with the respondent. (*Jibben v. Post & Brown Well Service,* supra.)

The appellants next contend the trial court erred in awarding workmen's compensation to the claimant based upon claimant's psychiatric problems in the absence of any substanial competent evidence that such problems are directly traceable to a known physical injury which arose out of and in the course of claimant's employment.

The appellee argues that the prevailing rule in Kansas is that an employer accepts the employee with the preexisting weaknesses of the employee at the time of his or her employment. It is argued this applies equally to psychiatric weakness as well as physical weaknesses. The appellee contends psychiatric weakness in the form of neurotic weakness on the part of the claimant does not lessen the compensability of an injury which precipitates a disabling neurosis. (Citing, Vol. 1A, Larson's Workmen's Compensation Laws § 42.22.)

It has been held when a primary injury under the Workmen's Compensation Act is shown to have arisen out of the course of the employment, every natural consequence that flows or results from the injury, including any new and distinct injury, is compensable if it is a direct and natural result of the primary injury. (*Jackson v. Stevens Well Service,* 208 Kan. 637, 493 P. 2d 264.)

In *Hayes v. Garvey Drilling Co.,* 188 Kan. 179, 360 P. 2d 889, the court was confronted with traumatic neurosis. There the district court found the claimant 100% totally and permanently disabled as a result of traumatic neurosis and that such condition was *directly caused* and was the result of the accident and injuries sustained by the claimant. On appeal the judgment of the trial court was affirmed on the ground that claimant's mental condition which ren-

dered him totally disabled was *directly traceable* to his accidental injury which disabled him. The claimant's mental condition was described as a chronic anxiety reaction. In the opinion the court said:

". . . Traumatic neurosis, following physical injury, long has been recognized as being compensable under workmen's compensation laws, and the rule is applicable to such injury even though financial and other worries play a part. . . ." (p. 184.)

"Traumatic neurosis" is defined as "A neurotic condition brought on by an injury." Trauma is defined as "An injury caused by mechanical violence, as a blow, twist, etc." (2 Schmidt's Attorneys' Dictionary of Medicine, p. 900.7.)

The testimony of Dr. Moe is that the claimant is unable to return to work at Cessna due to inner conflicts arising from guilt over sexual matters.

A review of two recent decisions of this court bearing on the subject tend to focus the issue presented more clearly.

In *Jacobs v. Goodyear Tire & Rubber Co.,* 196 Kan. 613, 412 P. 2d 986, the Goodyear Tire and Rubber Company of Kansas, Inc., installed a new tire building machine. Three tire builders, one from each eight hour shift, were chosen to work on the machine. The claimant was designated the builder on his shift. After the initial completion of a time study, a minimum-maximum quota for an eight hour shift was established. On several occasions claimant failed to produce the minimum number of tires and was reprimanded by supervisory personnel. He was also advised by management, both orally and by letter, that should he fail to meet the minimum quota disciplinary measures would have to be taken whereby he would receive a week's suspension and thereafter should he again fail, face possible job termination. During this same period of time claimant was being harassed by his co-employees who cautioned him against producing too many tires and thus setting the piece rate too high. Thereafter claimant failed to meet the minimum quota and was given a three day suspension. After the claimant returned to work the conflicts created by the demands of management on the one hand and his co-employees on the other made him nervous, irritable and unable to sleep at night, and because of these symptoms he was forced to seek the services and advice of the company doctor. The claimant consulted a qualified psychiatrist who placed him under treatment. After undergoing psychiatric treatment, the claimant returned to work.

Thereafter the claimant filed a claim for compensation and on the evidence presented, the examiner entered an award denying compensation. The director upheld the examiner's award, and on appeal, the district court, in affirming the decision of the director, found that the claimant's difficulty was the result of a mental illness, that he had suffered no physical blow or physical injury, and that he had not sustained personal injury by accident arising out of and in the course of his employment.

In *Jacobs* the claimant contended that inasmuch as this court has liberally construed personal injury by accident to include situations in which a series of physical events results in injury or death, under our decision dealing with traumatic neurosis a mental breakdown resulting from the stress of ordinary labor should also be compensable. The court pointed out that in all of the cases cited the disability or death resulted from events physical in nature (physical stimuli) as distinguished from solely mental stimuli, as in the case before the court. In upholding the trial court this court recognized it had on numerous occasions held *traumatic neurosis* following physical injury, and shown to be directly traceable to such injury, to be compensable under the act. But the court said, this rule had no application where the district court found that although claimant's difficulty was the result, of a mental illness, he had suffered no physical injury.

If the court had given full scope to the rule asserted by the appellee—that an employer accepts the employee with the pre-existing weaknesses in the employee at the time of her employment, and that it applies equally in psychiatric weakness as other physical weaknesses—then the court in *Jacobs* should have reversed the trial court. Certainly, the mental breakdown in the *Jacobs* case was attributable to the claimant's employment. But the court went further and said:

". . . Dr. Grimshaw described claimant's illness as a 'reactive depression as a result of the conflicts which he felt between his fellow workers on the one hand and management on the other, and as a result of what he felt was an unfair ultimatum given to him by the supervisor.' It was the doctor's opinion that claimant had certain personality characteristics which made him vulnerable to this type situation.

"From the foregoing testimony it appears that claimant's difficulty resulted from conflicts created by the opposing demands of management and union co-employees rather than the nature and requirements of his job. Such testimony would support the conclusion that there was no causal connection between the work being performed and claimant's condition. Moreover, the demands of the

co-employees were an external force over which management had no control or responsibility, and without them, it is speculative whether or not claimant would have encountered any difficulty." (p. 617.)

This leads to an analysis of *Berger v. Hahner, Foreman & Cale, Inc.*, 211 Kan. 541, 506 P. 2d 1175. There the claimant a 53 year old crane operator sustained an injury to his right eye when he started to help carpenters on the construction job. Psychiatric testimony indicated the claimant to be strongly preoccupied with his fate and worried about the future, and that he had suffered a severe reaction of guilt, anxiety and apprehension *as a result of the loss of his eye* and the resulting economic problems. The doctor concluded the claimant was approximately 100% disabled from a psychiatric point of view, and definitely in need of psychiatric treatment. There the trial court denied compensation on the ground that it was prohibited by law, but this court reversed holding that it was firmly established in this jurisdiction that *traumatic neurosis*, following physical injury *and shown to be directly traceable to the injury*, is compensable under the Workmen's Compensation Act. In the opinion the court said:

"It should be understood that according to the medical testimony, as interpreted by the examiner and the trial court in this case, the *traumatic neurosis* which progressed to a disabling degree was distinct and apart from the scheduled injury itself, as originally sustained, *but resulting from its sufferance. . . .*" (p. 547.) (Emphasis added.)

*Burger* stands for the proposition that *traumatic neurosis* following physical injury, and shown to be *directly traceable* to such injury, is compensable under the Workmen's Compensation Act.

In *Berger* the court distinguished the disabling traumatic neurosis cases from cases where additional incapacity followed a scheduled injury which was caused by a causalgia condition. In the sympathetic affliction cases additional compensation has been denied for an additional incapacity which is caused by a "causalgia" condition directly related to and arising from the original injury (*Schweiger v. Sheridan Coal Co.*, 132 Kan. 798, 297 Pac. 688; and *Riggan v. Coleman Co.*, 166 Kan. 234, 200 P. 2d 271). These sympathetic affliction cases are closely related to and have a bearing on the problem presented by the instant case.

To determine the point presently before the court we start with the proposition that psychiatric problems which cause disability of a workman, like any other compensable disability, must have a

direct causal connection between the work being performed and the neurosis.

Dr. Moe, the only psychiatrist to testify in the case, did not diagnose the claimant's condition as being that of *traumatic neurosis* or *conversion hysteria,* which the court in *Berger* recognized as synonymous terms. Dr. Moe's testimony was that the claimant demonstrated an "obsessive compulsive" personality, and indicated a high degree of anxiety with a tendency toward hypochondriasis, and immaturity to a surprising degree. The primary aspect of Dr. Moe's testimony is his opinion that the claimant had unconsciously resolved her *inner guilt feelings over sexual matters* by simply remaining away from the Cessna plant, and that the "injury" claimed has enabled her to remain away. In this respect, the claimant, according to Dr. Moe has indicated a tendency to convert her inner tensions into physical complaints.

The examiner in this case merely found that the claimant had "emotional problems". He made no finding that the claimant suffered traumatic neurosis or conversion hysteria. The district court *adopted* as its decision the award, findings and decision of the examiner, as approved by the director. Both the examiner and the district court found the claimant's emotional problems had been exacerbated by the accident. In other words that the claimant's *emotional problems* have become more intense as a result of the accident. There is *no* finding that the claimant's *emotional problems* were *directly traceable to the work being performed* by the claimant at the respondent's plant *or to the accident.*

This court has not previously held that "emotional problems" based on mental conflicts arising from guilt over sexual matters at the place of employment are compensable under the Workmen's Compensation Act.

The significance of *Jacobs* is that if claimant's psychiatric problems do not result from the nature and requirements of the claimant's job, or are the result of external forces over which the employer has no control, then there is no causal connection between the claimant's mental disability and the work being performed.

By analogy the claimant's *emotional problems* in the instant case, that of inability to return to Cessna due to her inner conflicts over sexual matters, do not arise from the nature and requirements of her job. Claimant's job was that of building pumps, deburring, working on a gear bench, some lifting of parts and tightening some nuts and bolts. Claimant, for pure personal reasons over which management

had no control, chose to wear provocative clothing, spend excessive time with make-up and be sexually provocative with male employees. The testimony of Dr. Moe is uncontradicted that the claimant's "condition"—an inability to return to Cessna for work—is due to her unconscious guilt feelings over sexual matters, and that she resolves her problem merely by staying away from Cessna. Her emotional problems, therefore, are not causally connected to the nature and requirements of her job, but to her anxieties and inner tensions created by her conduct on the one hand and her sense of morality on the other.

In *Berger* the court admonished:

"Even though this court has long held that traumatic neurosis is compensable; we are fully aware that great care should be exercised in granting an award for such injury owing to the nebulous characteristics of a neurosis. An employee who predicates a claim for temporary or permanent disability upon neurosis induced by trauma, either scheduled or otherwise, *bears the burden of proving by a preponderance of the evidence that the neurosis exists and that it was caused by an accident arising out of and during the course of his employment.* (p. 550.) (Emphasis added.)

We conclude that there is no evidence presented by the record and no finding by the trial court that the claimant's "emotional problems" were caused by the accident concerning which she complains. The evidence, at best is that the accident exacerbated her existing "emotional problems". This is insufficient to meet the requirement that the claimant's "emotional problems" be directly traceable to the accident.

Accordingly, the extent to which claimant was awarded compensation for disability based upon her "emotional problems" is erroneous and must be set aside.

The judgment of the lower court is reversed with directions to enter an award for the claimant based solely upon her disability resulting from physical injury sustained as a result of the accident on August 23, 1971.

PRAGER, J., dissenting: I respectfully dissent. The majority have properly held that there is substantial competent evidence to support the trial court's finding that the claimant sustained an accident which resulted in physical injury arising out of and in the course of her employment. The evidence in the case discloses that the claimant has suffered pain in her back and knee with reoccurring dizziness which at this time prevent her from returning to gainful employment. It is also clear from the evidence that a substantial

portion of her disability is the result of a traumatic neurosis which the trial court found was directly caused by and was the result of the accident and injuries sustained by the claimant. Syllabus ¶ 5 recognizes that traumatic neurosis, following physical injury and shown to be directly traceable to the injury, is compensable under the Workmen's Compensation Act. I do not agree with the conclusion of the majority that there is no substantial competent evidence to support the finding of the trial court that there is a direct causal connection between the claimant's accidental injury and her present disability including her traumatic neurosis. The medical experts agreed that prior to her injury the claimant was suffering from emotional problems which had a significant impact upon the nature and extent of her present disability resulting from the accident. There is substantial competent evidence to justify the trial court's finding of a causal connection between the accident and her present disability. Let us look at the record.

Dr. R. A. Crawford testified in part as follows:

"Q. . . . Can you say, Doctor, with a reasonable degree of medical certainty that the injuries of which Mrs. Rund complained and for which you treated her were connected with the injury that she had reported to you at Cessna Aircraft?

"A. Right.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. (By Mr. Forker) . . . And what you are saying then, Doctor, is knowing what she reported to you as to the nature of the injuries she received, and what you observed in the way of complaints and from the X-rays taken, would lead you to believe that the complaints derived from the injury at Cessna Aircraft Company, is that correct?

"A. Yes."

Dr. John B. Jarrott testified in regard to the causal connection between claimant's accidental injury and her present complaints in the following manner.

"Q. (By Mr. Forker) Dr. Jarrott, from your examination of the claimant, Mrs. Rund, from the X-rays available to you, including Dr. Crawford's X-rays, are you able to say with a reasonable degree of medical certainty that the pain and difficulty complained of by Mrs. Rund was caused by the injury which she described at Cessna Aircraft Products?

"A. Well, obviously, the only way that I can relate her findings to the accident is the history that she gave that she developed a backache after she slipped. Certainly the spondylolysis pre-existed the injury and if she sprained her back, she would get a backache.

"Q. So your answer to the question would be yes, with some reservations, is that correct?

"A. I believe so."

Dr. Frederick H. Moe, a psychiatrist with the Mental Health Institute in Hutchinson, testified without equivocation that the claimant's preexisting emotional problems were exacerbated by the accident which triggered the claimant's present complaints and disabilities. The record in this case shows a rather typical case of traumatic neurosis precipitated by a physical injury, the effects of which were made more severe by the preexisting emotional illness. The issue of causation was one to be determined by the trier of facts. In my judgment we have departed from the role of an appellate court and have assumed the role of a trial court by determining a factual issue in a way directly contrary to that of the examiner, the director and the district court.

FATZER, C. J. and OWSLEY, J., join in the foregoing dissenting opinion.